IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CURTIS NEWSOME | ) | Case No. 1:18-cv-2707 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Curtis D. Newsome seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating Listing 1.04A and Newsome's subjective symptom complaints, I recommend that the Commissioner's final decision denying Newsome's application for DIB be VACATED and that Newsome's case be REMANDED for further consideration.

## II.      Procedural History

On April 12, 2016, Newsome protectively applied for DIB.  (Tr. 161).[1]  He alleged that he became disabled on January 25, 2016, due to back pain, insomnia and anxiety.  (Tr. 161, 191).

---

[1] The administrative transcript is in ECF Doc. 10.

The Social Security Administration denied Newsome's application initially and upon reconsideration.  (Tr. 60-85).  Newsome requested an administrative hearing.  (Tr. 110).  ALJ Peter Beekman heard Newsome's case on January 24, 2018, and denied the claim in an April 26, 2018, decision.  (Tr. 15-25).  On September 21, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On November 20, 2018, Newsome filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

**III.    Evidence**

**A.    Relevant Medical Evidence**

X-rays of Newsome's lumbar spine on May 15, 2015 showed "mild degenerative disc disease at the L4-L5 level."  There was also posterior displacement of the distal coccyx likely traumatic, acute or old.  (Tr. 249).

On September 3, 2015, Newsome went to the emergency room complaining of low back pain.  He reported chronic back pain and felt that he had overworked it.  He had decreased range of motion, tenderness, bony tenderness, pain and spasms.  His gait was painful and abnormal. He was diagnosed with chronic back pain, sciatica – right, history of degenerative disc disease. (Tr. 363).  An X-ray of his lumbar spine on September 10, 2015 showed loss of disc height and endplate spondylosis at L4-L5 and L5-S1, and degenerative arthrosis of the lower lumbar facet joints.  (Tr. 351).

Newsome went to the emergency room on October 3, 2015 complaining of low back pain.  He reported chronic low back pain with this episode lasting "for a few weeks."  He reported pain shooting down his left leg.  His pain was exacerbated with movement.  (Tr. 331). X-rays of his left hip showed no acute fracture or dislocation.  X-rays of his lumbar spine

showed multilevel degenerative disc disease with disc space narrowing as L1-L2, L3-L4, and L5-S1; spurring at L1-2, L4-5 and L5-S1; and degenerative facet throughout the head L5-S1. (Tr. 248).  A CT scan of his abdomen showed mild urinary bladder wall thickening; L4-L5 disc herniation with suspected inferior extrusion resulting in deformity of the thecal sac.  (Tr. 260). He was diagnosed with lumbar disc herniation; acute exacerbation of chronic back pain; sciatica; and tachycardia.  (Tr. 332).

On October 27, 2015, Newsome saw Orthopedist Jason Eubanks, M.D., for tailbone injury and a two month history of back pain radiating into the L5 distribution to the left leg.  He reported that his pain was better when standing and worse with sitting.  He also reported numbness and tingling.  (Tr. 246).  Examination showed 5/5 strength in the lower extremities, positive straight leg raising test, and no pain with range of motion in the hips.  (Tr. 247).  Dr. Eubanks' impression was lumbar radiculopathy, secondary to an L-4-5 disc herniation.  He recommended a trial of steroid injections.  (Tr. 249).

On November 8, 2015, Newsome saw Melinda Lawrence, M.D., in the Pain Medicine Clinic.  He complained of low back pain and left leg pain for the past two months.   He had sharp shooting and burning pain and was taking Percocet for relief.  He reported that the pain was significantly impacting his life and making it difficult to work.  He had weakness in the left lower extremity.  Physical examination showed 4/5 motor strength in the left leg, antalgic gait, and decreased sensation in L4-L5 distribution of left leg.  Dr. Lawrence assessed chronic lumbar radiculopathy, lumbar disc displacement, and lumbar disc disease.  Dr. Lawrence planned for a left-sided L4-L5 lumbar transformal epidural steroid injection and referred Newsome to physical therapy.  (Tr. 258-260).  Newsome underwent a left L4 and L5 lumbar epidural steroid injection on November 25, 2015.  (Tr. 256).

On January 6, 2016, Newsome went to the emergency room complaining of severe right sided rib pain; he thought he pulled a muscle. He had awakened to severe pain and felt like an organ was going to burst. He was admitted for chest pain and tachycardia. He had an elevated d-dimer and he was initially tachycardic, with persistent right-sided chest pain, with significant pleuritic nature to it. He developed a reaction to the contrast die, which improved with Benadryl. He was worked up for chest pain, but his serial troponins were negative and there was no recommendation for stress tests. Studies were negative for pulmonary embolism. The final diagnosis was alcohol use, atypical chest pain, elevated AST, elevated d-dimer, elevated liver enzymes, hyperglycemia, hyperlipidemia, hyponatremia; other acute pulmonary embolism without acute cor pulmonale, steatosis of liver, and urinary tract infection. (Tr. 270-320).

On June 16, 2016, Newsome saw Dr. Anna Serels, M.D. He reported a long history of back pain. He did not have any significant inciting event, but he had been in many bike, moped and motor vehicle accidents over time. His pain was getting worse in the mid, lumbosacral junction, with bilateral radiation to both sides, worse on the left and several times a week would radiate down the entire left leg down to his toes. He had pins and needles in the posterior leg down to the calf and some left lower extremity weakness when getting out of a car. Newsome reported bladder incontinence every couple of months. Physical examination showed decreased lumbar range of motion in all directions, especially forward flexion and extension, which provoked his pain symptoms the most. There was tenderness over all the lumbosacral spinous processes and surrounding paraspinal musculature. Every point palpated in the low back and upper buttock muscles was tender to palpation. Straight leg raising tests were positive bilaterally. Lower extremities strength was 4/5 bilaterally at hip flexors, left ankle dorsiflexion, bilateral ankle inversion and aversion; antalgic gait; and Trendelenburg pattern weakness noted

4

bilaterally when doing single leg raise.  (Tr. 466-470).  X-rays of Newsome's hips were unremarkable but showed minimal osteophyte formation.  (Tr. 463).

An MRI of Newsome's lumbar spine on June 27, 2016 showed disc herniations at L4-5 and L5-S1 with left-sided predominance and "left-sided root sleeve involvement."  (Tr. 488-489).

Newsome followed-up with Dr. Lawrence on June 30, 2016.  Examination showed decreased lumbar range of motion, with pain; tenderness to palpation 4/5 bilateral hip flexors, left ankle dorsiflexion, bilateral ankle plantar flexion, and extensor hallucis longus bilaterally; patellar reflex on the right was more diminished compared to left, diminished Achilles reflex bilaterally.  His gait was antalgic.  Dr. Lawrence's impression was that Newsome's back pain was likely due to lumbar L4-5 radiculopathy, facet arthropathy, and reactive myofascial pain syndrome.  (Tr. 548-564).

Newsome saw Dr. Lawrence again on July 13, 2016.  He complained of back pain and continued radicular symptoms to his left side with the L4-L5 distribution.  He reported that a L4-L5 epidural steroid injection had decreased symptoms.  His pain was now mainly in his back.  He had been referred for more injections, but had not been evaluated by a spinal surgeon.  His weight was 242 pounds and his BMI was 33.75.  Examination showed decreased pinprick sensation at L4-5 distribution.  Newsome had a normal range of motion; his gait was grossly normal; his motor strength was 5/5 in his extremities and his reflexes were normal.  (Tr. 789).  Dr. Lawrence recommended repeat epidural injections, physical therapy, and Topamax for treatment for chronic lumbar radiculopathy and lumbar disc disease.  (Tr. 790-791).

Newsome saw Dr. Serels on September 1, 2016.  He reported no improvement of his lower back pain, which was "unbearable."  Shots and medications did not alleviate his pain and

he could not do physical therapy.  Epidural steroid injections alleviated his leg pain but not his

back pain.  He weighed 239 pounds and his BMI was 33.33.  (Tr. 550-557).

Newsome saw Brenda Beck, D.O. on September 7, 2016.  He primarily complained of

low back pain.  He reported that his left lower extremity pain had improved with lumbar

transforaminal epidural steroid injections.  However, he was now having widespread pain, neck

pain that radiated down his spine into the low back, shoulder pain and knee pain.  He described

his diffuse body pain as a 10/10.  He reported his pain was worse with standing, sitting, lying

down, walking and bending.  Pain was only alleviated with rest.  His pain was constant and was

interfering with his activities of daily living.  (Tr. 643).  Physical examination showed diffuse

tenderness to palpation along the lumbar paraspinal muscles as well as cervical paraspinal

muscles and both knees.  Motor strength was 5/5, but he had decreased pinprick sensation on the

left lower extremity in L4 and L5 distribution.  He had a flat affect.  (Tr. 645).

Newsome saw Dr. Lawrence again on October 26, 2016.  (Tr. 781).  He complained of

pain predominantly in the left L-4 and L5 distribution.  The pain was sharp, stabbing and

burning.  He had weakness in his leg and reported difficulty with ambulation.  (Tr. 781).

Examination showed decreased sensation in L4-L5 on the left.  Dr. Lawrence diagnosed chronic

lumbar radiculopathy and lumbar disc displacement.  She noted that his low back pain was

intractable and that he was no longer benefitting from injections.  She referred him back to Dr.

Eubanks to discuss interventional procedures.  (Tr. 784).

On October 28, 2016, Newsome saw Dr. Eubanks for a surgical consultation.  Newsome

reported back pain; leg pain had improved after the series of four steroid injections.  Examination

showed pain with range of motion of the hips, bilaterally; mildly positive straight leg raising test

on the left, and 5/5 strength in lower extremities.  Dr. Eubanks reviewed imaging of Newsome's

back and noted that there was no significant central canal narrowing.  Dr. Eubanks recommended non-operative care and strongly discouraged surgical intervention due to risk for pseudoarthrosis, persistent pain, and even adjacent segment problems.  (Tr. 589-591).

On December 6, 2016, Christopher Furey interpreted an MRI of Newsome's back.  The imaging showed mild degenerative changes with no significant stenosis.  (Tr. 586).

Newsome saw Dr. Elisabeth Roter on March 6, 2017 for an evaluation of his arthritis. (Tr. 624).  He complained of his whole body, muscles and bones hurting.  He was not seeing pain management because the injections did not help.  He was taking Lyrica and Tizanidine for fibromyalgia.  He reported that his feet and right knee occasionally swelled when he was on them too long.  He reported poor sleep and waking stiff and achy in the mornings.  He could not lie on his hips.  He reported numbness and tingling in his feet and spine, little spasms on the left side of his spine and frequent headaches.  Examination showed that he was 210 pounds and had a BMI of 29.29.  He had a depressed affect.  He held himself very rigidly when she checked his deep tendon reflexes.  He had normal strength throughout; bilateral knee crepitus; diffusely tender throughout, particularly in the back, and at 18 fibromyalgia tender points.  Dr. Roter's impression was chronic back pain; knee osteoarthritis; and fibromyalgia.  She explained that she did not treat fibromyalgia and recommended that he follow up with pain management.  (Tr. 622-624).

Newsome went to pain management on March 13, 2017.  He reported pain all over his body, in his low back, mid-thoracic spine, shoulders and hips.  He was taking Lyrica, which was helping.  He complained of spasms and cramps, pins/needles, numbness, tingling, tenderness and stabbing pain.  He complained of pain in both knees, which was worse with walking and movement.  He denied any radiation of pain from his low back to his knees.  He also reported

poor sleep; he was not sure whether Ambien was helping. (Tr. 634). Examination showed multiple tender points above and below the waist on both sides, palpable crepitus of both knees, and tenderness to palpation in his lumbar muscles. (Tr. 637).

Newsome underwent physical therapy from March 22, 2017 to May 8, 2017. (Tr. 652-664). He attended 9 out of 10 of his initial aquatic therapy sessions. (Tr. 663). At his May 22, 2017 session, Newsome reported that his knees and back still hurt and rated the pain as 8/10. (Tr. 652).

Newsome followed-up with Dr. Beck on May 25, 2017 for shoulder pain, knee pain and lower back pain. He continued to complain of all over body pain. He reported that Lyrica was alleviating his whole body pain but caused blurry vision at higher doses. (Tr. 725). Examination showed tenderness to palpation of the lumbar paraspinal muscles. (Tr. 728).

On June 16, 2017, Newsome underwent genicular nerve radiofrequency ablation of the right knee. (Tr. 743). He followed-up with Dr. Beck on June 21, 2017. He had swelling and bruising following the surgery. He noticed improvement of his knee pain after the procedure. He was instructed to continue Aleve as needed. (Tr. 713).

Newsome saw Dr. Beck again on September 22, 2017. He complained of right shoulder and back pain, worse with movement. He rated his pain as 7/10 and complained of some exacerbation of pain with aqua therapy. He displayed pain with abduction and rotation of the right shoulder, palpable crepitus of the right shoulder. Dr. Beck ordered X-rays of the right shoulder and prescribed Meloxicam for chronic back pain, myofascial pain syndrome, and Celecoxib arthropathy of the lumbar facet joint, right shoulder. Dr. Beck continued Newsome's prescription for Lyrica and aqua therapy. X-rays of the right shoulder showed mild degenerative changes. (Tr. 699-703).

Newsome continued aquatic therapy sessions from May 25, 2017 to October 6, 2017. (Tr. 680-697, 754).  During his session on August 31, 2017, Newsome reported buckling of his knees.  (Tr. 684).  At his visit on September 15, 2017, he complained of left shoulder pain and low back pain rated as 7/10.  On October 4, 2017, Newsome had 4/5 motor strength in both hips. (Tr. 755).  On October 6, 2017, he reported his knees and back really hurt.  This was his last visit because his insurance would only pay for 30 visits.  (Tr. 754).

Newsome saw Michael Retino, D.O. in the Orthopedic Clinic on October 26, 2017.  He complained of a two-year history of right shoulder pain.  (Tr. 776).  Examination showed discomfort with active and passive movement in the shoulder, significant weakness with drop arm testing and external rotation stressing.  He also had subacromial crepitus with passive movement.  X-rays showed very prominent greater tuberosity.  Dr. Retino suspected a rotator cuff tear and ordered an MRI.  (Tr. 778).  The MRI showed partial-thickness tearing of the undersurface of the supraspinatus; moderate acromioclavicular degenerative change; and degenerative tearing of the superior and posterosuperior labrum.  (Tr. 750).

Newsome followed-up with Dr. Retino on November 16, 2017.  (Tr. 770).  Dr. Retino reviewed the results of the MRI and told Newsome that he would probably eventually require rotator cuff repair.  Dr. Retino administered a cortisone injection.  (Tr. 773).

Newsome received a Ketamine infusion for his fibromyalgia on November 27, 2017.  (Tr. 757).  He followed-up with Dr. Beck on December 12, 2017.  He reported that the infusion had helped with his all over body pain and indicated Lyrica was also helping.  He still had low back, right shoulder and right knee pain.  (Tr. 760).  An MRI showed a tear and moderate osteoarthritis in his right shoulder.  (Tr. 765).  Dr. Beck diagnosed chronic back pain, fibromyalgia and knee osteoarthritis.  (Tr. 766).

B.      **Relevant Opinion Evidence - State Agency Consultants**

On behalf of the state agency, Gerald Klyop, M.D., reviewed Newsome's records on July 5, 2016 and found that he was capable of performing light work with occasional climbing of ladders, rope or scaffolds and occasional stooping.  (Tr. 70-73).  William Bolz, M.D., reviewed Newsome's records on September 19, 2016 and affirmed Dr. Klyop's opinion.  (Tr. 83-86).

C.      **Relevant Testimonial Evidence**

Newsome testified at the ALJ hearing.  (Tr. 35-51).  He was 47 years old and had an 11th grade education.  (Tr. 35).  He was able to drive.  (Tr. 39).  He had work experience as a press operator and at a crematory.  (Tr. 35).  As a press operator, he had to lift up to 30 pounds.  (Tr. 52).  At the crematory, he had to position and maneuver bodies and then move the bodies' remains in pans that weighed between 20 and 30 pounds.  (Tr. 36).

Newsome claimed disability beginning January 25, 2016 due to body pain – "everything hurts."  He felt that he was disabled because, with any amount of work, he would need to go to the emergency room to get injections in his back.  (Tr. 37).  He rated his pain as a 7 or 8 out of 10.  He took Tizanidine and a muscle relaxer for pain.  (Tr. 39).

Newsome took Buspirone for anxiety.  He took Lyrica for fibromyalgia.  (Tr. 44).  He had also had one Ketamine infusion and had two more scheduled.  (Tr. 47).  He was planning on starting aqua therapy again soon.  His insurance would only cover 30 sessions per year. (Tr. 40).

On an average day, Newsome would take medication, go to the bathroom, make coffee, turn the TV on and let his dogs out.  (Tr. 37-38).  Newsome would sometimes watch his 16-month-old granddaughter.  (Tr. 37).  He could lift his granddaughter, but he tried not to because it caused pain.  (Tr. 38).  If he wasn't watching his granddaughter, he would go back to bed after watching TV.  He could not watch a whole TV show because he couldn't sit or stand for long

periods of time.  (Tr. 41).  Newsome could stand for about 15-30 minutes at a time.  He stood for part of the hearing.  (Tr. 50-51).  He did household chores when he could.  (Tr. 39).

Vocational Expert ("VE") Gale Clear also testified at the hearing.  (Tr. 52-57)  Because none of the claims of error Newsome presents involve any claim of error related to the opinions of the VE, I will not provide a detailed summary of that testimony.  Suffice it to say, the VE testified that the ALJ's hypothetical person could not do Newsome's past work, but he identified a substantial number of other jobs such person could do in the national economy.  However, the VE testified that if the hypothetical individual also needed to elevate his legs to waist height occasionally throughout the workday, there would not be any jobs unless the employer was willing to allow a modification.  (Tr. 56).  If the individual was off task at least 20 percent of the day, or was restricted to occasional reaching of his dominant hand in all directions, no jobs would be available.  (Tr. 56-57).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. Newsome had the severe impairments of disorders of the back, degenerative disc disease, fibromyalgia, and unspecified arthropathies.  (Tr. 18).

4. Newsome did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 19).

5. Newsome had the residual functional capacity to perform light work, except he could lift or carry 10 pounds frequently; could occasionally lift or carry 20 pounds; could sit for six hours of an eight-hour workday; stand or walk for four hours of an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally stoop and crawl; occasionally reach overhead with the right dominant extremity; could never have concentrated exposure to extreme cold, humidity, or hazards such as unprotected heights and dangerous machinery. (Tr. 20).

10. Considering his age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Newsome could perform. (Tr. 24).

Based on all his findings, the ALJ determined that Newsome was not under a disability from January 25, 2016, the alleged onset date, through the date of his decision.  (Tr. 25).

**V.    Law & Analysis**

**A.    Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless

the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A]

decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when]

that error prejudices a claimant on the merits or deprives the claimant of a substantial right.");

*Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we

review decisions of administrative agencies for harmless error."). Furthermore, the court will not

uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical

bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.

Ohio 2011) (quoting *Sarchet v. Charter, 78 F.3d 305, 307* (7th Cir. 1996)); *accord Shrader v.*

*Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio

Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.

July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will

understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial

gainful activity; (2) if not, whether the claimant has a severe impairment or combination of

impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, she can perform other work found in the

national economy. 20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d

640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a), 416.912(a).

**B. Listing 1.04**

Newsome argues that the ALJ's finding that he did not meet or medically equal Listing 1.04 was not supported by substantial evidence from the record. At Step Three, the claimant has the burden of proving that he has an impairment or combination of impairments that meet or medically equal a listed impairment. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The claimant is conclusively presumed disabled if he meets or medically equals a listed impairment; otherwise, the evaluation proceeds to the fourth step. 20 C.F.R. § 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing."). "If . . . the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (quotation and alterations omitted); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain). Nonetheless, "the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks*, 544 F. App'x at 641; *see also Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) (stating that, when an ALJ "did not explicitly state that the appellant's impairments were not contained in the listings, such a determination was implicit in the ALJ's decision" because he

14

proceeded to Step Four).  When an ALJ fails to explain adequately why the claimant's impairments did not meet or medically equal a listed impairment, that error is harmless if the claimant does not produce sufficient evidence to show that his impairments met or medically equaled a listed impairment.  *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

Listing 1.04 is met when the claimant's spine disorder "result[s] in compromise of a nerve root . . . or the spinal cord," with:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04.

Regarding Listing 1.04, the ALJ stated:
The claimant's chronic back pain fails to meet or medically equal section 1.04 of Appendix 1 impairments.  The record evidence fails to demonstrate a nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory reflex loss, and positive straight leg raising in both the sitting and supine positions (1.04A).  Furthermore, the record evidence fails to establish a spinal arachnoiditis (1.04B) or lumbar spinal stenosis with pseudoclaudication (1.04C).  Accordingly, I find that the claimant's chronic back pain fails to meet listing level severity.
(Tr. 20).

15

Newsome argues that the ALJ's discussion of Listing 1.04 was inadequate and did not properly compare the evidence to the requirements of the Listing.  I agree.  The requirements of Listing 1.04A are:

1) Evidence of nerve root compression characterized by
   a. neuro-anatomic distribution of pain;
   b. limitation of motion of the spine,
   c. motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and,
   d. if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The record evidence raised at least a substantial question as to whether these requirements were met.  At page 22 of his decision, in discussing the medical evidence, the ALJ stated:

> A physical exam showed a reduced lumbar range of motion in all directions especially forward flexion and extension.  The claimant had a positive straight leg raise and tenderness over all the lumbosacral spinous processes and surrounding paraspinal musculature.  Every point that was palpated in the lower back and upper buttock muscles was tender to palpation.  The claimant had antalgic gait and toe-and-heel walked with difficulty.  Imaging on June 27, 2016 demonstrated disc herniations and L4-5 and L5-S1 with left sided predominance and left-sided root sleeve involvement.  (Exhibit 13F).

(Tr. 22).  This paragraph alone appears to demonstrate that most of the requirements for Listing 1.04 may exist in the record.  It showed reduced range of motion, positive straight leg raising test, neuro-anatomic distribution of pain, and imaging showing nerve root involvement.  The record also showed reduced muscle weakness in Newsome's lower extremities and hips.  (Tr. 259, 466, 470, 755).  Arguably, Newsome submitted evidence showing he met Listing 1.04A.

When the evidence could support a finding that the claimant's severe impairment meets a listing, the ALJ must "evaluate the evidence, compare it to . . . the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review."  *Reynolds,* 424 F. App'x 411, 416 (6th Cir. 2011); *See also, Hunter v. Astrue,* No. 1:09 cv 2790, 2011 U.S. Dist. LEXIS 148585 at

*10-12 (N.D. Ohio Dec. 20, 2011).  Here, the ALJ only listed the requirements for Listing 1.04 and summarily stated that the evidence didn't meet the requirements.

The Commissioner argues that the ALJ cited relevant records to support his findings. However, to support this argument, the Commissioner merely states: "the ALJ noted that in June 2016, Plaintiff had a grossly normal gait (Tr. 22-23, citing Tr. 789)."  ECF Doc. 15 at 5.  The Commissioner then cites other parts of the record showing that Newsome had normal range of motion and normal motor strength.  Id. citing Tr. 789.  However, the ALJ did not cite these records, and this court may not engage in post-hoc rationalizations. *See S.E.C. v. Chenery,* 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947).  Moreover, there are other records showing that Newsome's gait was abnormal and that he did *not* have full range of motion or normal motor strength.  (*See, e.g.,* Tr. 363, 259, 466, 470, 755).  And, the Commissioner does *not* argue that the evidence fails to support the other characteristics of nerve root compression such as: neuro-anatomic distribution of pain, limitation of motion of the spine, and involvement of the lower back, positive straight-leg raising test (sitting and supine).

Problematic for this court's analysis is the plain existence of medical records demonstrating impingements on a "root sleeve" in Newsome's back.  Absent from the ALJ's decision and the Commissioner's brief is any discussion of whether "nerve root compression" (required by Listing 1.04) and "root sleeve involvement" are different terms to describe the same thing or something different.  Absent nerve root compression, Listing 1.04 cannot be met.  I cannot find that the ALJ adequately considered whether Newsome's evidence met Listing 1.04 because the ALJ never commented on the significance of the "root sleeve involvement" in his dismissive analysis of Listing 1.04.

The Commissioner also criticizes plaintiff's brief for not offering any "pinpoint citations" to prove that he met the requirements of Listing 1.04. ECF Doc. 15 at 5. However, this court was able to find the evidence support in the pages Newsome cited. And, the citations in his reply brief more than make up for the general citations in his opening brief. His reply provides precise citations to the evidence in the record arguably supporting a Listing 1.04A finding. ECF Doc. 16 at 2-3. The Commissioner's argument that there are _no_ records supporting Newsome's argument that he met the requirements of Listing 1.04A is not well taken.

Because there was conflicting evidence and because the evidence potentially supported a finding that Newsome's impairment met Listing 1.04A, the ALJ should have provided a more detailed discussion than "claimant's chronic back pain fails to meet or medically equal section 1.04." Consistent with this Court's decision in *Hunter v. Astrue, supra,* I recommend that the Court remand the ALJ's decision and require that he fully evaluate the record evidence and determine whether Newsome's severe back impairment meets or equals Listing 1.04A.

### C.    Subjective Symptom Complaints

Newsome also argues that the ALJ did not comply with Social Security Ruling 16-3p in evaluating his subjective symptom allegations. A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective

medical evidence and the other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. § 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *see also Wilson v. Comm'r of Soc. Sec.*, No. 18-2343, 2019 U.S. App. LEXIS 23441 *33 (6th Cir. Aug. 6, 2019) ("The ALJ cannot reject the claimant's statements about the intensity and persistence of the claimant's pain or other symptoms about the effect these symptoms have on the ability to work solely because the available medical evidence does not substantiate the claimant's statements." (quotation marks and alterations omitted)).  Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).  While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Here, the ALJ failed to apply proper legal standards in evaluating Newsome's subjective complaints.  At page 7 of his decision, the ALJ reviewed and summarized Newsome's statements during the hearing testimony.  He then stated that Newsome's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 21).  The ALJ then summarized portions of Newsome's medical records – including facts that supported Newsome's subjective complaints – and concluded, "As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the medical record as a whole does not support the alleged level of limitation."  (Tr. 23).  The ALJ did not connect his summary of Newsome's statements or the medical evidence with his finding that Newsome's subjective complaints of pain should be discounted.  He did not compare Newsome's statements to his activities of daily living or cite specific medical records supporting his decision.

The Commissioner argues that the ALJ properly discounted Newsome's subjective complaints by noting that Newsome had a "grossly normal gait" and by pointing to "imaging showing mild degenerative changes with no significant stenosis."  ECF Doc. 15 at 7.  The ALJ *did* note this evidence in his summary of the medical evidence.  However, he did not relate these medical records to his assessment of Newsome's subjective complaints.  And, as noted above, the ALJ's summary of evidence also discussed portions of the records showing reduced lumbar range of motion, antalgic gait and imaging of herniations at L4-L5 with left-sided root sleeve involvement.  (Tr. 22).

The Commissioner also argues that the ALJ relied on medical opinion evidence in considering Newsome's subjective complaints.  ECF Doc. 15 at 8.  But even if that is true, the

ALJ did not explain such reliance in his decision.  The ALJ summarized the state agency reviewers' opinions and said that he gave them great weight.  (Tr. 23).  However, he did not compare their opinions to Newsome's subjective complaints, and it is difficult to see how their opinions, which reviewed records only, would have contradicted Newsome's subjective complaints.  If the records contradicted Newsome's complaints, the ALJ could have cited the records to support his finding.  He would not have even needed to rely on the medical opinions of the reviewing physicians.  The ALJ did not adequately explain why he discounted Newsome's subjective complaints.

Because the evidence both supported and contradicted Newsome's subjective symptoms, the ALJ needed to explain why he discounted Newsome's subjective complaints citing the evidence upon which he relied.  Even the ALJ's summaries of the evidence contained information that both supported and contradicted Newsome's subjective complaints.  His summaries of the evidence did not necessarily support his decision.  He failed to build a logical bridge between his findings and the evidence.  And, by failing to adequately explain his decision regarding Newsome's subjective complaints, he failed to properly apply SSR 16-3.

Substantial evidence may, in fact, have supported the ALJ's finding regarding Newsome's subjective complaints.  As argued by the Commissioner, the medical evidence summarized by the ALJ may have supported his decision.  However, the ALJ was required to clearly state his reason for discounting Newsome's subjective complaints and he failed to connect his summaries of medical evidence to his decision.  Because the ALJ failed to properly apply SSR 16-3p in evaluating Newsome's subjective complaints, I recommend that the case be REMANDED to the Commissioner for further explanation.

## VI.     Recommendation

Because the ALJ failed to apply proper legal standards in evaluating Listing 1.04A and

Newsome's subjective symptom complaints, I recommend that the Commissioner's final

decision denying Newsome's application for DIB be VACATED and that Newsome's case be

REMANDED for further consideration consistent with this report.

Dated: December 5, 2019

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  *See
United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140
(1985), reh'g denied, 474 U.S. 1111 (1986).